## Case No. 14,911.

### UNITED STATES v. CUTTER et al.

[2 Curt. 617.] [1]

Circuit Court, D. New Hampshire. Oct. Term, 1856.

NAVY AGENTS—DISBURSEMENT OF PENSION MONEY —LIABILITY OF SURETY—PRESIDENT'S DIRECTIONS.

1. The first section of the act of January 31. 1823 (3 Stat. 723), which requires the especial

---

[1] [Reported by Hon. B. R. Curtis, Circuit Justice.]

[1] [Reported by Hon. B. R. Curtis, Circuit Justice.]

direction of the president, to authorize the advance of public moneys to disbursing officers, is merely directory to the officers of government, and is not a qualification of the contract of the surety for such officer; and the surety is liable for the misappropriation of public money by his principal, though it was advanced to him contrary to this act.

2. As the president speaks and acts through the heads of departments in reference to the business committed to them, if money is advanced by the direction of the head of the proper department, the direction of the president will be presumed.

[Cited in Re Neagle, 39 Fed. 860.]

3. There is no such distinct office known to the constitution and laws of the United States as "navy pension agent"; and it is competent for the secretary of the navy to require the navy agents to pay these pensions. Having done so, the sureties of the navy agent are responsible for the faithful performance of that service.

[Cited in U. S. v. Wendell, Case No. 16.666.]

4. Though the mere naked declarations of the principal, unconnected with any act or transaction to which the contract of the surety relates, are not evidence against the surety, his declarations connected with such transactions are evidence against the surety.

[Cited in brief in Bank of Brighton v. Smith, 12 Allen, 248.]

[5. Cited in Chadwick v. U. S., 3 Fed. 755, to the point that treasury transcripts are admissible as evidence when suit is brought in any case of delinquency of a revenue officer or other person accountable for public money.]

This was an action of debt on the official bond of Charles W. Cutter as navy agent. Cutter having absconded was not served; but service was made on several of his sureties, who appeared and pleaded the general issue, with leave to give any special matter in evidence. It appeared on the trial that Cutter was duly appointed navy agent for the United States naval station at Portsmouth, on the seventeenth day of April, 1850. His appointment was to continue in force for the term of four years from the sixteenth day of the same April. The terms of his commission required him "carefully and diligently to discharge the duties of navy agent, by doing and performing all manner of things thereunto appertaining; and to observe and follow the orders and directions which he may from time to time receive from the president of the United States and the secretary of the navy." The bond declared on, bears date on the twenty-third day of April, 1850; and its condition is, that Cutter "shall faithfully discharge all his duties as navy agent in the navy of the United States." At the trial, the attorney for the United States offered to read, in evidence, copies of letters from Cutter to the secretary of the navy, and from the latter to Cutter, certified under the seal of the department. The defendant's counsel objected to their being read in evidence:—1. Because not annexed to any transcript of an account. 2. Because some of them are copies of letters to Cutter, who must be presumed to have the originals, and no notice has been given to him to produce them. 3. Because on this trial, Cutter not being a party, his admissions are not evidence, as against his sureties. The court overruled the objections and admitted the evidence,—it being admitted by the defendants that Cutter had absconded, and that his place of abode was unknown to the district-attorney. The plaintiffs called John B. Sullivan, who, being examined, stated that he was a clerk in the fourth auditor's office, which was charged by law with the settlement of the accounts of Cutter. He produced an account rendered by Cutter to the department, of the date of June 30, 1851, showing a balance against Cutter of $31,813.37. The witness stated that there was no change made in this account by the auditor,—it was allowed and settled as presented. He produced also another account rendered by Cutter, covering the period of time between the date of the last-mentioned account and the 24th day of July when Cutter was removed from office. This account consisted entirely of credits claimed by Cutter, which amounted to the sum of $22,000.80. The witness stated that the whole of this was allowed to Cutter, except two sums of $2,750, for which no voucher was produced, and $20, an error in overcharging commissions. And he produced an account stated on the books of the auditor, showing, that charging Cutter with the balance of his former account, $31,812.37, and crediting him with the amount found due to him as navy agent, he was a defaulter to the amount of $12.581.57 in that capacity. The witness further stated, that by the direction of the secretary of the navy, the navy agents paid the navy pensions, and that consequently Cutter had another account as navy pension agent; and he produced an account rendered by Cutter to the department, in that capacity, and bearing date on the first day of July, 1851, showing a balance against Cutter of $1,437.52. This account had been allowed as correct by the auditor. As to the balance of Cutter's account as navy agent, the defence was. that one of the items of debit in that account amounting to the sum of $18,400 had gone into Cutter's hands contrary to one of the regulations of the navy department, and without any order from the president of the United States. And the defendants offered evidence tending to show that by a standing regulation of the navy department made on the first day of June, 1849, "The requisitions of disbursing officers through the bureaus of the navy department, must be accompanied by the triplicate of the bill to be paid, duly receipted by the storekeeper. or other proper officer authorized to receipt for supplies, and approved by the senior officer present." That during the period of time in question, a dry dock was building at the navy yard in Portsmouth by contractors; and that in reference to the payments on account of that contract, the secretary of the navy directed this regulation to be so far modified, that moneys might

be advanced to the navy agent upon certificates of the officer inspecting the work, approved by the senior officer present. That on the third day of April, 1850, Cutter forwarded to the bureau of docks and yards, a requisition for money on account of this contract, of $18,400, accompanied by the required certificate of the inspecting officer approved by the senior officer. It appeared that the course of business of the bureau of the department in case of regular requisitions, was for the bureau to draw on the secretary, who ordered the money to be remitted or not as he should see proper. On this occasion such a draft was drawn by the head of the bureau on the secretary of the navy, and by his order the required sum of $18,400 was remitted to Cutter. On the twenty-third day of the same April, Cutter made another requisition on the bureau for the same sum of $18,400, accompanied by the triplicate of the bill, approved by the senior officer, from which it appeared that this last requisition was for the same payment for which the first was made. The head of the bureau drew on the secretary for this sum, and it was by the order of the secretary sent to Cutter. It did not appear whether the first sum had been actually remitted to Cutter when the second was ordered to be paid to him, nor was it made certain, by any direct evidence, whether it was intended that Cutter should have in his hands $18,400, in anticipation of a payment, or whether it was by an oversight and mistake of the department, that he received one of these sums. The evidence was such that the jury might have come to either of these results. The court ruled, that this evidence and any inferences of fact which the jury could legitimately draw from it, would not in point of law, relieve the sureties from responsibility for this item of $18,400.

In respect to the balance due from Cutter, as navy pension agent, it was insisted by the defendants that it was not within the condition of the bond, because this was only for the faithful performance of the duties of navy agent, and a witness was called by the defendants, who testified that he held the office of navy agent at Portsmouth, after Cutter's removal, and that he received a separate appointment and gave a separate bond as navy pension agent. But the court ruled that the business of paying navy pensions did not constitute a separate office; that there was no such distinct office known to the law of the United States as "navy pension agent"; that it was competent for the secretary of the navy to assign this business to navy agents, and if he did so, it became part of the duties of their offices, for the faithful performance whereof their sureties would be liable.

It was then agreed between the counsel, with the sanction of the court, that the case should be taken from the jury and the questions of law considered by the court, and a verdict directed as the court might think the law required; it being understood that before the case should be finally committed to a jury, either party might take a bill of exceptions.

Mr. George, U. S. Dist. Atty.

G. Marston and T. W. Emery, contra.

CURTIS, Circuit Justice. I have now maturely considered the questions of law involved in this case, and will proceed to state my opinion thereon, and to give such directions to the jury as will finally dispose of the case in this court.

The first question which I have considered, arises out of the evidence respecting the circumstances under which the two sums of $18,400 came into the hands of Cutter. It is not denied, that this was public money of the United States, nor that it came into the hands of Cutter to be applied by him as navy agent, to pay for the building of the dry dock at the navy yard at Portsmouth. But the ground is, that no order of the president of the United States appears to have justified this advance of money to the disbursing officer, and that in respect to one of those sums, it was paid to him without his having produced the voucher required by the regulation of the navy department.

One argument for the defendants is, that the act of congress of January 31, 1823, § 1, prohibits an advance of public money to any disbursing officer, without the especial direction of the president, and that the government has shown no such especial direction in this case. In Williams v. U. S., 1 How. [42 U. S.] 290, the supreme court had occasion to put a construction on this section, and held, that general instructions by the president to the secretary of the treasury, to make such advances to the marshals of the United States as the secretary should deem proper, and the act of the secretary in making the advance brought the case under this law; that such duties can be performed by the president only through the agency of the appropriate department and the act of the head of that department is, in legal effect, the act of the president. That case differs from this, in so far as there was oral evidence in that case, of some former general directions of the president. No oral or written evidence has been given in this case, of any directions by the president to the secretary of the navy on this subject.

The question is, is any such evidence necessary? The act of congress which authorizes the construction of this dock (9 Stat. 170), contains this language: "That the secretary of the navy is hereby directed to cause to be constructed at each of the navy yards, at Kittery, &c., and the sum of fifty thousand dollars is hereby appropriated towards said dock at Kittery." By a subsequent act (9 Stat. 270, 271), the secretary is required to make a contract with one of two sets of contractors, therein named, for building and com-

pleting this dock. By two subsequent acts (9 Stat. 377–516), further appropriations were made for prosecuting and completing the work. There can be no doubt therefore, that the whole subject of the construction of this dock was placed by congress under the care of the secretary of the navy. In Wilcox v. Jackson, 13 Pet. [38 U. S.] 498, the question arose whether the president had reserved from sale a particular tract of land. The court say: "At the request of the secretary of war, the commissioner of the general land-office, in 1824, colored and marked upon the map this very section, as reserved for military purposes, and directed it to be reserved from sale for those purposes. We consider this, too, as having been done by authority of law; for amongst other provisions in the act of 1830 (4 Stat. 420), all lands are exempted from pre-emption, which are reserved from sale by order of the president. The president speaks and acts through the heads of the several departments, in relation to the subjects which appertain to their respective duties. Both military posts and Indian affairs, including agencies, belong to the war department. Hence we consider the act of the war department in requiring this reservation to be made, as being in legal contemplation the act of the president; and, consequently, that the reservation thus made was, in legal effect, a reservation made by order of the president, within the terms of the act of congress."

I am unable to distinguish the question in this case, from that arising in Wilcox v. Jackson [supra]. Here the secretary of the navy not only had committed to him generally, the subject of naval affairs, but the construction of this dock, was expressly placed under his care by the acts of congress, authorizing its erection. In reference to this subject it may be said, with even more propriety than in Wilcox v. Jackson, that whatever the president is to do, he is to do through and by the secretary. This money was advanced to Cutter in each instance, by the order of the secretary. So far as the authority of the president was necessary, I must consider him as speaking and acting through the secretary to whom the subject was committed by congress. I must presume, in the absence of all evidence, that the advances made, were with his approbation and under his direction, within the meaning of the act of congress. But if this were otherwise,—if the especial personal direction of the president were necessary to bring the advance within the act of 1823, I should have great difficulty in holding, that the absence of that direction would prevent the sureties from being responsible for public money actually received by the navy agent. It came into his hands to be applied to the uses of the government. He was bound so to apply it. His failure to do so was unfaithful conduct in his office. And for all unfaithful conduct by him, the sureties are responsible, unless it appears that a particular transaction is not within their contract. Reduced to its

real substance the argument in their favor is, that though they were responsible, according to the terms of their bond, that Cutter should faithfully perform the duties of navy agent, it is not a duty of a navy agent faithfully to apply public moneys which come to his hands contrary to the command of this act of congress. Now, the second section of this act, and another act containing provisions similar to that of its third section, have been under the consideration of the supreme court; and it has been held that these provisions of law are merely directory to the officers of the government, and make no part of the contract with the surety; that they are created by the government for its own security, and to regulate the conduct of its own affairs, and that though the surety may place confidence in the agents of the government, and expect them to observe the prescribed regulations, he has the same means of judgment as to their fidelity in office, as the government itself has, and the latter does not undertake to guaranty that fidelity. U. S. v. Kirkpatrick, 9 Wheat. [22 U. S.] 720; U. S. v. Vanzandt, 11 Wheat. [24 U. S.] 184; Smith T. v. U. S., 5 Pet. [30 U. S.] 292; Dox v. Post-Master General, 1 Pet. [26 U. S.] 318. I perceive no sound distinction in this respect between the first section of the act now under consideration, and the second and third sections which have been thus interpreted. The former relates to placing money in the hands of the officer; the latter to allowing it to remain there, and his continuance in office. Each of these regulations, would, if observed, tend to diminish the responsibility of the surety, and to save him from loss. If it be not a part of his contract that one should be observed, neither is it that the other should be. Indeed, in the case of Minor v. Mechanics Bank of Alexandria, Id. 46, the supreme court held that even if the president and directors of a bank were to conspire with the cashier to enable him to misappropriate the money of the bank, this would not save his sureties, which clearly shows that the obligee does not guaranty to the sureties, the faithful observance by others, of those precautions which, if observed, would tend materially to their security. And these views apply also to the argument grounded on the failure to observe the regulation of the department requiring the production of the triplicate bill, before remitting the money. This was a regulation made by the government for its own security, in the conduct of its business, which formed no part of the contract of the surety; it was clearly in the power of the secretary to dispense with it, if he thought it needful to do so; and the failure to observe it constitutes no defence. Nor does the fact that two sums of $18,400, instead of one, were advanced to Cutter, in any view which may be taken of the evidence, amount to a defence. If this was done inadvertently and through laches, it is settled by the cases above cited, that the laches of its officers cannot prejudice the government. Whether by

laches or design, these two sums came to the hands of Cutter, it was public money received by him in his capacity of navy agent, and which he was bound, in that capacity, to apply to the uses of the United States. His misappropriation of it, was unfaithful conduct as a navy agent, and for this, by the terms of their contract, the sureties are responsible.

The next inquiry is whether these sureties were responsible for the faithful application by Cutter of the funds intrusted to him for the payment of navy pensions. In the case of Browne v. U. S. [Case No. 2,036], I had occasion to examine the question, whether the employment to pay navy pensions constituted a distinct office, under the constitution and laws of the United States. I came to the conclusion that it did not; that this duty was assigned by the secretary of the navy to the navy agents as part of their duties as navy agents. To this conclusion I now adhere. The terms of Cutter's commission as navy agent authorize and require him "carefully and diligently to discharge the duties of navy agent, by doing and performing all manner of things thereunto appertaining; and he is to observe and follow the orders and directions which he may from time to time receive from the president of the United States and the secretary of the navy." The terms of the commission are, therefore, broad enough to include all duties which might from time to time be assigned to the officer by the orders of the secretary of the navy, provided they are among the things which by law may appertain to the office. As was observed in Browne v. U. S. [supra], no other description of the duties and powers of this office is known to me, except that contained in the act of March 3, 1809, § 3 (2 Stat. 536), to make contracts or for the purchase of supplies, or for the disbursement, in any other manner, of moneys for the use of the navy of the United States. There can be no doubt that moneys paid to officers and seamen as pensions, are disbursed for the use of the navy of the United States, and that it is within the terms of the commission issued to Cutter, for the secretary of the navy to order him to pay them. When such an order had been made, the faithful disbursement of the public moneys intrusted to him for this purpose, became part of his duties as navy agent, and as such within the terms of the contract of his sureties that he would faithfully perform all the duties of navy agent. The cases bear a very close resemblance to Minor v. Mechanics Bank of Alexandria, 1 Pet. [26 U. S.] 72. In that case a by-law of the bank provided that "the cashier shall do and perform all other duties that may from time to time be required of him by the president or board of directors relative to the affairs of the institution." When Minor was appointed cashier, the duties of teller were also assigned to him. Though the office of teller and the distinct accounts which belonged to it were still kept up, the court held that the duties of teller thenceforth became part of the duties of cashier, and the sureties, who had undertaken for the faithful performance of the duties of cashier were responsible also for the performance of those duties which had previously belonged to the office of teller. That his bond as cashier must be construed to cover all defaults in duty annexed to the office from time to time by those authorized to make such annexation.

The remaining inquiry is, whether the copies of the correspondence were rightly admitted. Very little practical importance can be attached to this inquiry in this case, because the letters bore only on the question of Cutter's being a defaulter, and as the state of his accounts, as settled at the treasury, was fully shown, by unexceptionable evidence, the admission or rejection of the letters became immaterial. But I think they were rightly admitted. The act of congress of September 15, 1789 (1 Stat. 69, § 5), provides that the secretary of state shall cause a seal of office to be made, &c., "and all copies of records and papers in the said office, authenticated under the said seal, shall be evidence equally as the original record or paper." By the act of February 22, 1849 (9 Stat. 347, § 3), it was enacted, that "copies of books, papers, documents, and records in the war, navy, treasury, and post-office departments, and in the attorney-general's office, may be certified in the same manner, and with the same effect as those in the department of state." This correspondence, which consisted of letters to and from Cutter, was so certified. But it is objected that the copies of the letters to Cutter are not admissible, because they are only copies of copies; that if the copies which are in the navy department had been produced, they would not be admissible without accounting for the failure to produce the originals in the possession of Cutter. But when it was admitted that Cutter was an absconding defaulter, and that his place of abode was unknown to the district attorney, the failure to produce the originals is accounted for. It was further objected that Cutter's admissions are not evidence against his sureties. I am inclined to think the mere naked admissions of the principal, not made in the course of any business, or as parts of any acts with which the surety is connected by his contract, cannot be received in evidence against the surety. The laws on this subject are collected in 1 Phil. Ev. 297, 390, and in 3 Cow. & H. & Edw. Notes, pp. 241–245. There are cases which go so far as to admit the declarations of the principal as evidence against the surety, without restriction as to the time or circumstances under which they were made. There is also another class of cases, in which it is held that, a judgment against the principal is evidence against the surety, of the demand which it establishes.

Drummond v. Prestman, 12 Wheat. [25 U. S.] 515; Heard v. Lodge, 20 Pick. 53. But in this case it is only needful to say, that the letters, both of the secretary and Cutter are not mere naked declarations. They are demands on the one part for payment, and on the other part replies to that demand. They are strictly part of the res gestæ in the administration of that office, for the faithful conduct of which the sureties were bound. And such are admissible in evidence against the sureties, upon the same principle that his accounts, rendered to the department are admissible.

I have now considered all the questions raised in this case. I am of opinion that there should be a verdict rendered for the plaintiff. Upon this verdict judgment must be rendered for the amount of the penalty of the bond, to be discharged on payment of the amount actually due; that is to say, the two sums of $12,581.57, and $1,437.52, amounting to the sum of $14,019.09, with interest from the date of the writ. See Farrar v. U. S., 5 Pet. [30 U. S.] 373; Ives v. Merchants Bank, 12 How. [53 U. S.] 159.