## *In re* NEAGLE.

*(Circuit Court, N. D. California.* September 16, 1889.)

1. UNITED STATES COURTS—JURISDICTION—HABEAS CORPUS.

Under the provisions of sections 751–753, Rev. St., the courts of the United States and their judges have jurisdiction, upon a writ of *habeas corpus*, to inquire into the cause of the imprisonment of the petitioner; and if, upon such inquiry, he is found to be "in custody for an act done or omitted, in pursuance of a law of the United States," he is entitled to be discharged, no matter from whom or under what authority, the process under which he is held may have issued: the constitution, and laws of the United States made in pursuance thereof, being the supreme law of the land.

2. SAME.

In the exercise of this jurisdiction, there is no conflict of authority between the state and the United States. The laws of the United States being the supreme law of the land, the authority of the state, in such cases, is subordinate, and that of the United States paramount.

3. CONSTITUTIONAL LAW—STATE LAWS.

A state law which contravenes a valid law of the United States is void. In legal contemplation, there can no more be two valid conflicting laws, operating upon the same subject-matter, at the same time, than, in physics, two bodies can occupy the same space at the same time.

4. SAME—LAWS OBSTRUCTING UNITED STATES OFFICER.

The United States is a government, with authority extending over the whole territory of the Union, acting upon the states, and the people of the states. While limited in the number of its powers, it is, so far as its sovereignty extends, supreme. No state can exclude it from exercising those powers, obstruct its authorized officers, against its will, or withhold from it the cognizance of any subject which the constitution has committed to it.

5. SAME.

The constitution and laws of the United States, as to those matters wherein they are supreme, extend over every foot of the territories of the United States, and the jurisdiction of its courts to enforce rights derived thereunder is as extensive as the territory to which they are applicable.

6. SAME—RIGHT OF NATIONAL GOVERNMENT TO PRESERVE ORDER.

The national government has power to command obedience to its laws, to preserve order, and to keep the peace, in matters affecting national interests, and no person or power in the land has a right to resist or question its authority, so long as it keeps within the bounds of its jurisdiction.

7. SAME—PROTECTION OF JUDGES.

It is within the power of the government of the United States to protect all the agencies and instrumentalities necessary to accomplish the objects and purposes of that government. It is therefore empowered to protect the lives of the judges of its courts from assault and assassination, on account of their judicial decisions, by desperate, disappointed litigants, not only while actually holding court, but while such judges are traveling through their circuits for the purpose of holding courts at the different places therein appointed by law for that purpose.

8. POWERS OF UNITED STATES MARSHAL.

An assault upon, or an assassination of, a judge of the United States court, while engaged in any matter pertaining to his official duties, on account or by reason of his judicial decisions or action in performing his official duties, is a breach of the peace, affecting the authority and interests of the United States, and within the jurisdiction and power of the United States marshal or his deputies to prevent, as a peace-officer of the national government.

9. SAME.

By section 788, Rev. St., and the several provisions of the statutes of California prescribing the duties of sheriffs, by that section made applicable to

v.39F.no.15—53

marshals, the United States marshal is made a peace-officer, and, as such, he is authorized to preserve the peace so far as a breach of the peace affects the authority of the United States, and obstructs the operations of the government and its various departments. The courts of the United States must be enabled fully to perform all the functions imposed upon them by the constitution and laws, without hindrance or obstruction, and they have the inherent power to protect themselves by and through their executive officers, under the direction and supervision of the attorney general and the president, against obstruction and hindrance in the performance of their judicial duties.

10. SAME—HOMICIDE BY MARSHAL—HABEAS CORPUS—JURISDICTION.

Where a deputy United States marshal, acting under instructions from his superior officers,—the United States marshal and the attorney general,—in protecting the life and person of a justice of the supreme court of the United States from a murderous assault, made on account of his judicial decisions, at the hands of a dissatisfied litigant, finds it necessary to take the life of the assailant, and is arrested by the state authorities, and held upon a charge of murder for such act, the United States circuit court may. upon *habeas corpus*, discharge such United States officer from the custody of the state authorities, upon it being shown that the homicide was necessary, or that it was reasonably apparent to the mind of the deputy-marshal, at the time and under the circumstances surrounding him. that the killing was necessary in order to protect and defend the justice from great bodily injury, or to save his life.

11. SAME.

The homicide in such case, if an offense at all, is an offense under the laws of the state, and only the state can deal with it, in that aspect. It is not claimed to be a crime punishable under the laws of the United States. But the homicide, when necessarily committed by a deputy-marshal in the performance of his duty, in protecting the life and person of a justice of the United States circuit court from assault and violence because of his judicial decisions, is an "act done in pursuance of a law of the United States," and is not and cannot, therefore. be an offense against the laws of the state, no matter what the statute of the state may be; the laws of the United States being the supreme law of the land.

12. SAME.

It is the exclusive province of the United States courts to ultimately and conclusively determine any question of right, civil or criminal, arising under the laws of the United States. It is therefore the prerogative of the national courts to construe the national statutes, and determine, upon *habeas corpus*, whether a homicide for which the petitioner is charged with murder by the state authorities was the result of an "act done in pursuance of a law of the United States;" and, when that question has been determined in the affirmative, the prisoner will be discharged, and the state has nothing more to do with the matter.

13. IMPLIED POWERS OF THE NATIONAL GOVERNMENT.

All the law of the United States is not specifically expressed in statutory enactments. Many powers are necessarily inherent in the various departments of the government, without which the government could not perform functions necessary to its existence. The exercise of such powers is, nevertheless, in pursuance of the laws of the United States.

14. SAME—STATUTES—CONSTRUCTION

When statutes confer powers, impose duties. and provide for the accomplishment of various objects, they are necessarily couched in general terms, but they carry with them, by implication, all the powers, duties, and exemptions necessary to accomplish the objects thereby sought to be attained.

15. ACTS OF HEADS OF GOVERNMENTAL DEPARTMENTS.

The acts of the heads of departments of the United States government, in the line of their duties, are, in contemplation of law, the acts of the president himself.

16. HOMICIDE—KILLING IN DEFENSE OF ANOTHER.

A party resisting a murderous assault, where several lives are in danger, being in the best position to judge as to the dangers and requirements of the occasion, is the one to determine when the proper moment has arrived, in self-defense, to slay his assailant, in order to be justified by the law; and if he acts in good faith, with reasonable judgment and discretion, the law will

justify him, even though he errs. Where several lives are in danger from the assault of a powerful, infuriated, desperate man, common prudence would dictate that the party assailed should fire a second or two too soon, rather than a fraction of a second too late.

## Habeas Corpus.

This is an application for the discharge of David Neagle upon a writ of *habeas corpus.* It arises out of the following facts: On the third of September, 1888, certain cases were pending in the circuit court of the United States for the Northern district of California, between Frederick W. Sharon, as executor, against David S. Terry and Sarah Althea Terry, his wife, and between Francis G. Newlands, as trustee, and others, against the same parties, on demurrers to bills to revive and carry into execution the final decree of the court in the suit of *William Sharon* v. *Sarah Althea Hill,* and were decided on that day. That suit was brought to have an alleged marriage contract between the parties adjudged to be a forgery, and obtain its surrender and cancellation. The decree rendered adjudged the alleged marriage contract to be a forgery, and ordered it to be surrendered and canceled. The decree was rendered after the death of William Sharon, and was therefore entered as of the day when the case was submitted to the court. By reason of the death of Sharon, it was necessary, in order to execute the decree, that the suit should be revived. Two bills were filed,—one by the executor of the estate of Sharon; and the other, a bill of revivor and supplemental by Newlands, as trustee, for that purpose. In deciding the cases, the court gave an elaborate opinion upon the questions involved, and, while it was being read, certain disorderly proceedings took place, for which the defendants, David S. Terry and his wife, were adjudged guilty of contempt, and ordered to be imprisoned. The following is an accurate statement of those proceedings, slightly condensed from the opinion of the court delivered on the subsequent application of David S. Terry to have the order of commitment revoked. For the whole proceeding, see *In re Terry,* 36 Fed. Rep. 419.

Shortly before the court opened, the defendants came into the court-room, and took their seats within the bar at the table next to the clerk's desk, and almost immediately in front of the judges; the defendant David S. Terry being at the time armed with a bowie-knife, concealed on his person, and the defendant Sarah Althea, his wife, carrying in her hand a small satchel, which contained a revolver of six chambers, five of which were loaded. The court at the time was held by the justice of the supreme court of the United States allotted to this circuit, who was presiding, the United States circuit judge of this circuit, and the United States district judge of the district of Nevada, called to this district to assist in holding the circuit court. Almost immediately after the opening of the court, the presiding justice commenced reading its opinion in the cases mentioned, but had not read more than one-fourth of it when the defendant Sarah Althea Terry arose from her seat, and asked him, in an excited manner, whether he was going to order her to give up the marriage contract to be canceled. The presiding justice replied:

"Be seated, madam." She repeated the question, and was again told to be seated. She then cried out, in a violent manner, that the justice had been bought, and wanted to know the price he held himself at; that he had got Newlands' money for his decision, and everybody knew it,—or words to that effect. It is impossible to give her exact language. The judges and parties present differed as to the precise words used, but all concurred as to their being of an exceedingly vituperative and insulting character. The presiding justice then directed the marshal to remove her from the court-room. She immediately exclaimed that she would not go from the room, and that no one could take her from it, or words to that effect. The marshal thereupon proceeded towards her to carry out the order for her removal, and compel her to leave, when the defendant David S. Terry rose from his seat, evidently under great excitement, exclaiming, among other things, that "no living man shall touch my wife," or words of that import, and dealt the marshal a violent blow in his face. He then unbuttoned his coat, and thrust his hand under his vest, where his bowie-knife was kept, apparently for the purpose of drawing it, when he was seized by persons present, his hands held from drawing his weapon, and he himself forced down on his back. The marshal then removed Mrs. Terry from the court-room. Soon afterwards Mr. Terry was allowed to rise, and was accompanied by officers to the door leading to the corridor on which was the marshal's office. As he was about leaving the room, or immediately after stepping out of it, he succeeded in drawing his knife, when his arms were seized by a deputy-marshal and others present, to prevent him from using it, and they were able to take it from him only after a violent struggle. The petitioner, Neagle, wrenched the knife from his hand, while four other persons held on to the arms and body of Terry, one of whom presented a pistol to his head, threatening at the same time to shoot him if he did not give up the knife. To these threats Terry paid no attention, but held on to the knife, actually passing it during the struggle from one hand to the other. Mr. Cross, a prominent attorney, who on that accasion sat next to Mrs. Terry, a little to her left and rear, testifies that, just before she arose to interrupt Justice Field, she nervously worked at the clasp of a small satchel about nine inches long, and tried to open it; and not succeeding, in consequence of her excitement, she hastily sprang to her feet, and interrupted the justice, as hereinbefore stated. Knowing that she had before drawn a pistol from a similar satchel in the master's room, he concluded at this time that she was trying to get her pistol out, and he consequently held himself in readiness to seize her arm as soon as it should appear, and endeavor to prevent its use until he could get assistance, his right arm being partially disabled. For one occasion in the master's office, see *Sharon* v. *Hill*, 11 Sawy. 123, 24 Fed. Rep. 726. At this time Mrs. Terry sat directly in front of Justice Field and the circuit judge, less than four yards from either. A loaded revolver was afterwards taken from this satchel by the marshal. For their conduct and resistance to the execution of the order of the court, the defendants, Sarah Althea Terry and David S. Terry, were adjudged guilty

of contempt, and ordered to be imprisoned, the former for thirty days, and the latter for six months.

In consequence of the imprisonment which followed, various threats of personal violence to Justice Field and the circuit judge were made by Terry and his wife. Those threats were that they would take the lives of both of those judges. Those against Justice Field were sometimes that they would take his life directly; at other times, that they would subject him to great personal indignities and humiliations, and, if he resented it, they would kill him. These threats were not made in ambiguous terms, but openly and repeatedly, not to one person, but to many persons, until they became the subject of conversation throughout the state, and of notice in the public journals. Reports of these threats through the press, and through reports of the United States marshal and United States attorney, reached Washington, and in consequence of them the attorney general thought proper to give instructions to the marshal of the United States for the Northern district of California to take proper measures to protect the persons of those judges from violence at the hands of Terry and his wife. On the return of Justice Field from Washington to attend his circuit in June last, the probability of an attack by Judge Terry upon him was the subject of conversation throughout the state, and of notices in some of the journals in the city of San Francisco. It was the general expectation that, if Judge Terry met Justice Field, violence would be attempted upon the latter. In consequence of this general belief and expectation, and the fact that the attorney general of the United States had given instructions to the marshal to see that the persons of Justice Field and of the circuit judge should be protected from violence, the marshal of the Northern district appointed the petitioner in this case, David Neagle, to accompany Mr. Justice Field while engaged in the performance of his duties, and while passing from one district to another within his circuit, so as to guard him against the threatened attacks. He was specially commissioned as a deputy by Mr. Franks, whose instructions to him were that he should protect Justice Field at all hazards, and, knowing the violent and desperate character of Terry, that he should be active and alert, and be fully prepared for any emergency, but not to be rash; and, in case any violence was attempted from any one, to call upon the assailant to stop, and to inform him that he was an officer of the United States. Judge Terry was a man of great size and strength, who had the reputation of being always armed with a bowie-knife, in the use of which he was specially skilled, and of showing great readiness to draw and use it upon persons towards whom he entertained any enmity, or had any grievance, real or fancied.

On the 8th of August, 1889, Justice Field left San Francisco for Los Angeles, in order to hear a *habeas corpus* case which was returnable before him at that city on the 10th of August, and also to be present at the opening of the court on the 12th. He was accompanied by Deputy-Marshal Neagle, the petitioner. Justice Field heard the *habeas corpus* case on the 10th of August. On the 12th of August he opened the circuit court, Judge Ross sitting with him, and he delivered on the lat-

ter day an opinion in an important land case, and also an opinion in the *habeas corpus* case. On the following day the court heard an application for an injunction in an important water case from San Diego County. No other cases being ready for hearing before the circuit court, he took the train on Tuesday, the 13th, at 1:30 o'clock in the afternoon, for San Francisco, where he was expected to hear a case then awaiting his arrival immediately upon his return, being accompanied on his return by Deputy-Marshal Neagle. On the morning of the 14th, between the hours of 7 and 8, the train arrived at Lathrop, in San Joaquin county, which is in the Northern district of California, a station at which the train stopped for breakfast. Justice Field and the deputy-marshal at once entered the dining-room there to take their breakfast, and took their seats at the third table in the middle row of tables. Justice Field seated himself at the extreme end, on the side looking towards the door. The deputy-marshal took the next seat on the left of the justice. What subsequently occurred is thus stated in the testimony of Justice Field:

"A few minutes afterwards, Judge Terry and his wife came in. When Mrs. Terry saw me, which she did directly she got diagonally opposite me, she wheeled around suddenly, and went out in great haste. I afterwards understood, as you heard here, that she went for her satchel. Judge Terry walked past, opposite to me, and took his seat 'at the second table below. The only remark I made to Mr. Neagle was: 'There is Judge Terry and his wife.' He remarked: 'I see him.' Not another word was said. I commenced eating my breakfast. I saw Judge Terry take his seat. In a moment or two afterwards I looked round, and saw Judge Terry rise from his seat. I supposed at the time he was going out to meet his wife, as she had not returned, so I went on with my breakfast. ' It seems, however, that he came round back of me,—I did not see him,—and he struck me a violent blow in the face, followed instantaneously by another blow. Coming so immediately together, the two blows seemed like one assault. I heard 'Stop! stop!' cried by Neagle. Of course, I was for a moment dazed by the blows. I turned my head round, and I saw that great form of Terry's, with his arm raised, and his fists clenched to strike me. I felt that a terrific blow was coming, and his arm was descending in a curved way, as though to strike the side of my temple, when I heard Neagle cry out, 'Stop! stop! I am an officer.' Instantly two shots followed. I can only explain the second shot from the fact that he did not fall instantly. I did not get up from my seat, although it is proper for me to say that a friend of mine thinks that I did; but I did not. I looked around, and saw Terry on the floor. I looked at him, and saw that peculiar movement of the eyes that indicates the presence of death. Of course, it was a great shock to me. It is impossible for any one to see a man in the full vigor of life, with all those faculties that constitute life, instantly extinguished, without being affected, and I was. I looked at him for a moment, then rose from my seat, went around, and looked at him again, and passed on. Great excitement followed. A gentleman came to me whom I did not know, but I think it was Mr. Lidgerwood, who has been examined as a witness in this case, and said: 'What is this?' I said: 'I am a justice of the supreme court of the United States. My name is Judge Field. Judge Terry threatened my life, and attacked me, and the deputy-marshal has shot him.' The deputy-marshal was perfectly cool and collected, and stated: 'I am a deputy-marshal, and I have shot him to protect the life of Judge Field.' I cannot give you the exact words, but I give them to you as near as I can remember them. A few moments afterwards the deputy-marshal said to me: 'Judge, I think you had

better go to the car.' I said: 'Very well.' Then this gentleman, Mr. Lidgerwood, said: 'I think you had better;' and with the two I went to the car. I asked Mr. Lidgerwood to go back and get my hat and cane, which he did. The marshal went with me, remained for some time, and then left his seat in the car, and, as I thought, went back to the dining-room. (This is, however, I am told, a mistake, and that he only went to the end of the car.) He returned, and either he or some one else stated that there was great excitement; that Mrs. Terry was calling for some violent proceedings. I must say here that, dreadful as it is to take life, it was only a question of seconds whether my life or Judge Terry's life should be taken. I am firmly convinced that, had the marshal delayed two seconds, both he and myself would have been the victims of Terry."

In answer to a question whether he had a pistol or other weapon on the occasion of the homicide, Justice Field replied: "No, sir. I have never had on my person, or used, a weapon since I went on the bench of the supreme court of the state, on October 13, 1857, except once." That was on an occasion when he crossed the Sierra Nevada mountains, in 1862. "With that exception, I have not had on my person, or used, a pistol or other deadly weapon."

Mr. Neagle, in his testimony, stated that, before the train arrived at Fresno, he got up and went out on the platform, leaving the train, and there saw Judge Terry and his wife get on the cars; that when the train arrived at Merced he spoke to the conductor, Woodward, and informed him that he was a deputy United States marshal; that Judge Field was on the train, and also Judge Terry and his wife, and that he was apprehensive that when the train arrived at Lathrop there would be trouble between those parties; and inquired whether there was any officer at that station, and was informed, in reply, that there was a constable there; that he then requested the conductor to send word to the officer to be at Lathrop on the arrival of the train, and that he also applied to other parties to induce them to endeavor to secure assistance for him at that place, in case it should be needed. The deputy-marshal further stated that, when the train arrived at Lathrop, Justice Field went into the dining-room, he accompanying the justice; that they took seats at a table; that, shortly after they were seated, Judge Terry and his wife entered the dining-room, his wife following him several feet in the rear; that, when the wife reached a point nearly opposite Justice Field, she turned around, and went out rapidly from the room, and, as appeared from what afterwards followed, she went to the car to get her satchel. When she returned from the car, the satchel was taken from her, and it was found to contain a pistol—revolver—containing six chambers, all of which were loaded with ball. This pistol lay on the top of the other articles in the satchel. The witness further stated that Judge Terry passed down, opposite Justice Field, to a table below where they were sitting; that in a few minutes, while Justice Field was eating, Judge Terry rose from his seat, went around behind him,—the justice not seeing him at the time,—and struck him two blows, one on the side, and the other on the back, of the head; that the second blow followed the other immediately; that one was given with the right hand, and the other

with the left; that Judge Terry then drew back his hand, with his fist clenched, apparently to give the justice a violent blow on the side of his head, when he (Neagle) sprang to his feet, calling out to Terry: "Stop! Stop! I am an officer;" that Terry bore at the time on his face an expression of intense hate and passion, the most malignant the witness had ever seen in his life, and that he had seen a great many men in his time in such situations, and that the expression meant life or death for one or the other; that as he cried out those words: "Stop! Stop! I am an officer," he jumped between Terry and Justice Field, and at that moment Judge Terry appeared to recognize him, and instantly, with a growl, moved his right hand to his left breast, to the position where he usually carried his bowie-knife; that, as his hand got there, the deputy-marshal raised his pistol, and shot twice in rapid succession, killing him almost instantly. He further stated that the position of Judge Field was such —his legs being at the time under the table, and he sitting—that it would have been impossible for him to have done anything, even if he had been armed; and that Judge Terry had a very furious expression, which was characterized by the witness as that of an infuriated giant. He also added that his cry to him to stop was so loud that it could be heard throughout the whole room, and that he believed that a delay in shooting of two seconds would have been fatal both to himself and Justice Field.

The facts thus stated in the testimony of Justice Field and the petitioner were corroborated by the testimony of all the witnesses to the transaction. The petitioner soon afterwards accompanied Justice Field to the car, and while in the car he was arrested by a constable, and at the station below Lathrop was taken by that officer from the car to Stockton, the county-seat of San Joaquin county, where he was lodged in the county jail. Mr. Justice Field was obliged to continue on to San Francisco without the protection of any officer. On the evening of that day, Mrs. Terry, who did not see the transaction, but was at the time outside of the dining-room, made an affidavit that the killing of Judge Terry was murder, and charged Justice Field and Deputy-Marshal Neagle with the commission of the crime. Upon this affidavit, a warrant was issued by a justice of the peace at Stockton against Neagle, and also against Justice Field. Subsequently, after the arrest of Justice Field, and after his being released by the United States circuit court on *habeas corpus* upon his own recognizance, the proceeding against him before the justice of the peace was dismissed, the governor of the state having written a letter to the attorney general of the state, declaring that the proceeding, if persisted in, would be a burning disgrace to the state, and the attorney general having advised the district attorney of San Joaquin county to dismiss it. There was no other testimony whatever before the justice of the peace, except the affidavit of Sarah Althea Terry, upon which the warrant was issued.

In the suit of William Sharon against Mrs. Terry in the circuit court of the United States, it was adjudged that the alleged marriage contract between her and Sharon, produced by her, was a forgery, and it was

held that she had attempted to support it by perjury and subornation of perjury. She had also made threats during the past year, and up to the time of the shooting of Judge Terry, that she would kill the circuit judge and Justice Field, and she repeated that threat up to the time she made her affidavit for the arrest of Justice Field and Neagle; and that she had made such threats was a notorious fact in Stockton and throughout the state. The petition was accordingly presented, on behalf of Neagle, to the circuit court of the United States, for a writ of *habeas corpus* in this case, alleging, among other things, that he was arrested and confined in prison for an act done by him in the performance of his duty, namely, the protection of Mr. Justice Field, and taken away from the further protection which he was ordered to give to him. The writ was issued, and upon its return the sheriff of San Joaquin county produced a copy of the warrant issued by the justice of the peace of that county, and of the affidavit of Sarah Althea Terry, upon which it was issued. A traverse to that return was then filed in this case, presenting various grounds why the petitioner should not be held, the most important of which were that an officer of the United States, specially charged with a particular duty, that of protecting one of the justices of the supreme court of the United States while engaged in the performance of his duty, could not, for an act constituting the very performance of that duty, be taken from the further discharge of his duty, and imprisoned by the state authorities; and that when an officer of the United States, in the discharge of his duties, is charged with an offense consisting in the performance of those duties, and is sought to be arrested, and taken from the further performance of them, he can be brought before the tribunals of the nation of which he is an officer, and the fact there inquired into. The attorney general of the state appeared with the district attorney of San Joaquin county, and contended that the offense of which the petitioner is charged could only be inquired into before the tribunals of the state. The question of the jurisdiction of the national tribunal to interfere in the matter was elaborately argued by counsel; the attorney general of the state and Mr. Langhorne appearing with the district attorney of San Joaquin county on behalf of the state, and Mr. Carey, United States attorney, and Messrs. Herrin, Mesick, and Wilson appearing on behalf of the petitioner. The latter did not pretend that any person in this state, high or low, who committed a crime, might not be tried by the local authorities, if it were a crime against the state; but that when, in the performance of his duties, that alleged crime consisted in an act which is deemed a part of the performance of a duty devolved upon him by the laws of the United States, it was within the competency of the national tribunals to determine, in the first instance, whether that act was a duty devolving upon him, and, if it was a duty devolving upon him, the officer had committed no offense against the state, and was entitled to be discharged.

*John T. Carey*, U. S. Atty., *Richard S. Mesick, Samuel M. Wilson, Wm. F. Herrin, W. L. Dudley, C. L. Ackerman, J. C. Campbell,* and *H. C. Mc-Pike,* for petitioner.

*G. A. Johnson*, Atty. Gen., *J. P. Langhorne*, and *Avery C. White*, Dist. Atty., for respondent.

Before SAWYER, Circuit Judge, and SABIN, District Judge.

SAWYER, J., (SABIN, D. J., *concurring*.) The petitioner has sued out a writ of *habeas corpus*, returnable before the court, alleging that he is unlawfully deprived of his liberty and imprisoned by virtue of a warrant issued by a justice of the peace of San Joaquin county, in this state, charging him with a felonious homicide, while the act thus character- ized was a lawful act performed in the discharge of his duties as an offi-· cer of the United States; and the first question presented is whether this court has jurisdiction to inquire into the truth of that allegation.

Upon the question of jurisdiction, section 751, Rev. St., provides that "the supreme court and the circuit and district courts shall have power to issue writs of *habeas corpus*;" and section 752 further provides that "the several justices and judges of the said courts, within their respective ju- risdictions, shall have power to grant writs of *habeas corpus* for the pur- pose of an inquiry into the cause of restraint of liberty." There is no limit in these provisions to the jurisdiction of these courts and judges to inquire into the restraint of liberty of any person. But section 753 pre- scribes some limitations, among which is "that the writ shall not extend to a prisoner in jail, * * * unless he is in custody for an act done or omitted in pursuance of a law of the United States, or of an order, process or decree of a court thereof, or in custody in violation of the con- stitution, or of a law or treaty of the United States," and this legislation, in the language of the chief justice, in *McCardle's Case*, 6 Wall. 325, 326, in commenting upon the same provisions in a prior act, "is of the most comprehensive character. It brings within the *habeas corpus* jurisdiction of every court, and of every judge, every possible case of privation of liberty, contrary to the national constitution, treaties or laws. It is im- possible to widen this jurisdiction." And again, in *Ex parte Royall*, 117 U. S. 249, 6 Sup. Ct. Rep. 734, the supreme court says:

"As the judicial power of the nation extends to all cases arising under the constitution, the laws and treaties of the United States; as the privilege of the writ of *habeas corpus* cannot be suspended unless when in cases of rebellion or invasion, the public safety may require it; and as congress has power to pass all laws necessary and proper to carry into execution the powers vested by the constitution in the government of the United States, or in any depart- ment or officer thereof; no doubt can exist as to the power of congress thus to enlarge the jurisdiction of the courts of the union, and of their justices and judges. That the petitioner is held under the authority of a state cannot af- fect the question of the power or jurisdiction of the circuit court, to inquire into the cause of his commitment, and to discharge him if he be restrained of his liberty in violation of the constitution. The grand jurors who found the indictment, the court into which it was returned and by whose order he was arrested, and the officer who holds him in custody, are all equally with indi- vidual citizens, under a duty, from the discharge of which the state could not release them, to respect and obey the supreme law of the land; 'anything in the constitution and laws of any state to the contrary notwithstanding,' and that equal power does not belong to the courts and judges of the several states;

that they cannot under any authority conferred by the states, discharge from custody persons held by authority of the courts of the United States, or of commissioners of such courts, or by officers of the general government acting under its laws, results from the supremacy of the constitution and laws of the United States. *Ableman* v. *Booth*, 21 How. 506; *Tarble's Case*, 13 Wall. 397; *Robb* v. *Connolly*, 111 U. S. 624, 4 Sup. Ct. Rep. 544. We are, therefore, of opinion that the circuit court has jurisdiction upon writ of *habeas corpus* to inquire into the cause of appellant's commitment, and to discharge him, if he be held in custody in violation of the constitution."

In the exercise of this jurisdiction there is no conflict between the authority of the state and of the United States. The state in such cases is subordinate, and the national government paramount. "The constitution and laws of the United States are the supreme law of the land, and to these every citizen of every state owes obedience, whether in his individual or official capacity." *Siebold's Case*, 100 U. S. 392. See, also, *Tennessee* v. *Davis*, Id. 257, 258. The exclusive authority of the state to determine whether an offense has been committed against the laws of the state is now earnestly pressed upon our attention. In *Siebold's Case* the court says:

"It seems to be often overlooked that a national constitution has been adopted in this country, establishing a real government therein, operating upon persons and territory and things; and which, moreover, is, or should be, as dear to every American citizen as his state government is. Whenever the true conception of the nature of this government is once conceded, no real difficulty will arise in the just interpretation of its powers. But if we allow ourselves to regard it as a hostile organization, opposed to the proper sovereignty and dignity of the state governments, we shall continue to be vexed with difficulties as to its jurisdiction and authority. No greater jealously is required to be exercised towards this government in reference to the preservation of our liberties than is proper to be exercised towards the state governments. Its powers are limited in number, and clearly defined, and its action within the scope of those powers is restrained by a sufficiently rigid bill of rights for the protection of its citizens from oppression. The true interest of the people of this country requires that both the national and state governments shall be allowed, without jealous interference on either side, to exercise all the powers which respectively belong to them according to a fair and practical construction of the constitution. State rights and the rights of the United States should be equally respected. Both are essential to the preservation of our liberties and the perpetuity of our institutions. But, in endeavoring to vindicate the one, we should not allow our zeal to nullify or impair the other." 100 U. S. 394. See Id. 266, 267.

This court, then, has jurisdiction to inquire upon this writ into the cause of the imprisonment of the petitioner, and if, upon such inquiry, he is found to be "in custody for an act done or omitted in pursuance of a law of the United States," then he is in custody in violation of the constitution and laws of the United States, and he is entitled to be discharged, no matter from whom or under what authority the process under which he is held may have issued—the constitution and laws of the United States made in pursuance thereof being the supreme law of the land.

The homicide in question, if an offense at all, is, it must be conceded, an offense under the laws of the state of California, and the state, only,

can deal with it, *as such*, or *in that aspect*. It is not claimed to be an offense under the laws of the United States. But if the killing of Terry by Neagle, was an "act done * * * in pursuance of a law of the United States," within the powers of the national government, then it *is not*, and *it cannot* be, an offense against the laws of the state of California, no matter what the statute of the state may be, the laws of the United States being the supreme law of the land. A state law, which contravenes a valid law of the United States, is, in the nature of things, necessarily void—a nullity. It must give place to the "supreme law of the land." In legal contemplation, there can no more be two valid laws, which are in conflict, operating upon the same subject-matter, at the same time, than, in physics, two bodies can occupy the same space at the same time. But, as we have seen by the authorities cited, it is the exclusive province of the judiciary of the United States, to, ultimately, and, conclusively, determine any question of right, civil or criminal, arising under the laws of the United States. It is, therefore, the prerogative of the national courts to, conclusively, construe the national statutes, and determine, whether the homicide in question, was the result of an "act done in pursuance of a law of the United States," and, when that question has been determined in the affirmative, the petitioner must be discharged, and the state has nothing more to do with the matter. All we claim, is, the right to determine the question, was the homicide the result of "an act done in pursuance of a law of the United States?" and if so, discharge the petitioner. As incidental to, and involved in, that question, it is necessary to inquire, whether the act of the petitioner, was performed under such circumstances as to justify it. If it was, then, he was in the line of his duty. If not, then, he acted outside his duty. We do not make the inquiry, at all, for the purpose of determining, whether the act was an offense, or justifiable under the statutes of the state. We do not assume to consider the case, in that aspect, at all. We simply determine, whether it was an act, performed in pursuance of a law of the United States. Nor do we act, in this matter, because we have the slightest doubt, as to the impartiality of the state courts, and their ability, and disposition, to, ultimately, do exact justice to the petitioner. We have not the slightest doubt, or apprehension in that particular; but, there is a principle involved. The question, is, has the petitioner *a right* to have his acts adjudged, and, if found to have been performed in the strict line of his authority, and duty, a *further right*, to be protected, by that sovereignty, whose servant he is, and whose laws he was executing? If he has that right, then, there is no encroachment upon the state jurisdiction, and this court must, necessarily, entertain his petition, and determine his rights under it, and under the laws of the United States. It has no discretion. It cannot decline to hear him without an utter disregard of one of the most important duties imposed upon it by the constitution, and laws of the United States. What the state tribunals might, or might not, do, in this particular instance, is not a matter for a moment's consideration.

The question, is, what are the rights of the petitioner, as to having his case heard, and disposed of, in the courts of the sovereignty, whose

servant he is, and whose laws he was employed in executing. If he has a right to be heard in this court, then, we must hear him, willing, or unwilling. There is no alternative. Whether the writ should issue, in this case, was not a question of "expediency," and whether the petitioner shall be discharged, or remanded, is not a question of "policy," or "comity," as suggested in some quarters. It is a question of *personal right, and personal liberty*, arising under the constitution, and laws of the United States, which the court cannot ignore. There is a class of cases, of which *Ex parte Royall* is an example, in which the court may exercise a discretion, as to the *time* of interference, but, in our opinion, this is not one of them. *Ex parte Royall*, 117 U. S. 251, 6 Sup. Rep. 734. But, if it rests in our discretion to discharge, or remand, the petitioner to the state courts, to be, there, first tried for an offense against the state, while we are satisfied, that he is entitled to be discharged, to what useful end would he be sent back, since, upon being tried, and convicted, he would still be discharged by the national courts on *habeas corpus*, if the act should appear to them to have been performed in pursuance of a law of the United States? This would be, but to put the state to *great, useless expense*, and subject the petitioner, if guilty of no offense, to unjust imprisonment, in violation of his legal rights, until his trial could be had, and his writ of *habeas corpus* afterwards, again, sued out, heard and decided, when the result, in all probability, would, at last, be the same. Evidently, public justice demands, that the case should be "summarily" decided, now, as required by section 761, Rev. St. The court has no right to trifle with the petitioner's constitutional rights by, unnecessarily, subjecting him to unjust imprisonment, great expense, and vexatious delays. In case of a remand, and conviction, the national courts must hear and decide the case, at last. Far better for all concerned, that they should decide it, now, and, forever, end it. We have no desire to usurp a jurisdiction, that does not belong to us. We have enough to do, in exercising the admitted jurisdiction conferred upon us, without seeking to enlarge it in the smallest particular, but we must perform our duty, as we understand it, be the consequences, what they may.

The statutes of the United States, also make, ample provision for giving full effect to the jurisdiction of this court, in cases where the petitioner alleges, that he is restrained of his liberty, in violation of the constitution, or of a law of the United States, in section 766, which reads as follows, to-wit:

"Pending the proceedings or appeal in the cases mentioned in the three preceding sections, and until final judgment therein, and after final judgment of discharge, any proceeding against the person so imprisoned or confined or restrained of his liberty, in any state court, or by or under the authority of any state, for any matter so heard and determined, or in process of being heard and determined, under such writ of *habeas corpus*, shall be deemed null and void."

It is, therefore, only necessary, in order to dispose of the case, to inquire, and ascertain, whether the petitioner is in custody for an act done in pursuance of a law of the United States.

As we have seen from the statement of facts, Mr. Justice Field, of the United States supreme court, allotted to the Ninth circuit, was traveling, officially, from one part of his circuit to another, in pursuance of the requirements of the statutes of the United States, for the purpose of holding a circuit court.   By reason of threats against his life, made by dissatisfied litigants, generally, known, and published in the newspapers, and brought to the knowledge of the United States marshal for the northern district of California, and by him called to the attention of the attorney general of the United States, that officer directed the marshal to furnish the justice with protection, while thus engaged in the performance of his judicial duties, on the circuit.   The marshal, deeming it proper, furnished the necessary protection, by assigning that duty to the petitioner, who was a United States deputy-marshal.   The claim, is, that the petitioner, as such deputy-marshal, was affording the only protection practicable to Justice Field, in the lawful discharge of his duty, when the homicide was committed, and that the killing was necessary for the preservation of the lives of both Justice Field, and himself, at the time the fatal shot was fired.   The homicide was committed at Lathrop, and not upon land purchased by the United States with the consent of the state for the needful uses of the United States, in pursuance of article 1, § 8, of the constitution.   Conceding the points to be as stated, do they present a case of an act performed in pursuance of a law of the United States, subject to their jurisdiction and to the jurisdiction of this court, and, is the petitioner held under an arrest on a charge of murder by the state, "in custody in violation of the constitution or laws of the United States," within the meaning of the statute?

It is urged, that, since the homicide was committed in the state at large, and not in the court-house, or upon land within the exclusive jurisdiction of the United States, the question, as to whether the homicide is murder, is a question arising, exclusively, under the laws of the state, and, that it can be investigated, and determined by the state courts, alone.   It is admitted on the part of the state, that the United States have exclusive jurisdiction over the custom-house block, and, "over all places purchased by the consent of the legislature of the state, in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings," in pursuance of section 8, art. 1, of the national constitution, and that, the state has no jurisdiction, whatever, of any offense committed in such places.   But it is contended, that the United States have no jurisdiction of offenses committed outside the lands so purchased, in other portions of the state, but, that, in the state at large, the jurisdiction of the state is exclusive.   This proposition, like most others urged by those, who insist on extreme state rights doctrines, wholly ignores the principle, that there can be no legal conflict, or inconsistency, in matters wherein the state is subordinate, and the United States are paramount—where the constitution, and laws of the United States, are the supreme law of the land.   We have, already, seen, that, although in certain cases, the courts of the United States have jurisdiction to discharge on *habeas corpus*, prisoners held in custody by the state

courts, in violation of the constitution, and laws of the United States, yet, that, the state courts "cannot, under any authority conferred by the state, discharge from custody, persons held by authority of the courts of the United States, or of commissioners of such courts, or by officers of the general government, acting under such laws," and, that this "results from the supremacy of the constitution and laws of the United States." This principle, established in the *Booth* and *Tarble Cases*, was recently properly recognized by the supreme court of California, when upon the return of the writ of *habeas corpus* in *Terry's Case*, it appearing, that he was in custody by virtue of a judgment of the United States circuit court, it declined to require the sheriff to produce his body. As the powers and duties of the state and national courts, are by no means reciprocal, in this class of cases, so, they are not reciprocal, in the matter of territorial jurisdiction mentioned, as claimed on the part of the state. The constitution and laws of the United States, as to those matters wherein they are supreme, extend over every foot of the territories of the United States, and the jurisdiction of its courts, to enforce rights derived thereunder, is as extensive, as the territory to which they are applicable.

In *Siebold's Case*, the supreme court, in reply to an argument in favor of a wide extension of state rights, uses the following language, peculiarly applicable to the point now under consideration:

"Somewhat akin to the argument which has been considered is the objection, that the deputy-marshals authorized by the act of congress to be created and to attend the elections are *authorized to keep the peace;* and that this is a duty which belongs to the state authorities alone. It is argued *that the preservation of peace and good order in society is not within the powers confided to the government of the United States, but belongs exclusively to the states.* Here, again, we are met with the theory that the government of the United States does not rest upon the soil and territory of the country. We think that this theory is founded on an entire misconception of the nature and powers of that government. We hold it to be an incontrovertible principle, that the government of the United States may, by means of physical force, exercised through its official agents, execute on every foot of American soil the powers and functions that belong to it. This, necessarily, involves the power to command obedience to its laws, *and hence the power to keep the peace to that extent.* This power to enforce its laws, and to execute its functions in all places does not derogate from the power of the state to execute its laws, at the same time, and in the same places. The one does not exclude the other, except where both cannot be executed at the same time. In that case the words of the constitution itself show which is to yield. 'This constitution, and all laws which shall be made in pursuance thereof, shall * * * be the supreme law of the land.'" 100 U. S. 394, 395.

### And again:

"The argument is based on a strained and impracticable view of the nature and powers of the national government. *It must execute its powers or it is no government. It must execute them on the land as well as on the sea, on things as well as on persons. And, to do this, it must necessarily have the power to command obedience, to preserve order and keep the peace; and no person or power in this land has the right to resist or question its authority, so long as it keeps within the bounds of its jurisdiction.*" Id. 396.

The power to keep the peace is a police power, and the United States have the power to keep the peace in matters affecting their sovereignty. There can be no doubt, then, that the jurisdiction of the United States is not affected, by reason of the place,—the locality,—where the homicide occurred. If the locality is a necessary element of jurisdiction, a majority of the offenses created by the statutes, would be out of their jurisdiction, and the statutes creating such offenses, would be nullities, and practically useless. For example, for a quarter of a century, the United States courts in this state, were held in rented buildings owned by private parties. They had no jurisdiction over them under the provision of section 8, art. 1, of the national constitution; and no jurisdiction other, than, that had over other portions of the country to which the constitution and its laws extended. Had an assault been committed in open court, upon the judge, in one of these buildings, and the assailing party been slain by the marshal in protecting the judge, under circumstances excusing, or justifying, the homicide, would it be pretended, that the court would have no jurisdiction to protect him from interference by the state government? Or, have the United States, and their courts, no jurisdiction over the offense of resisting a United States marshal in the lawful execution of the process of the courts? or over the crime of counterfeiting the coin, or forging the bonds, or other securities of the United States, or other offenses against the laws, unless the offense is committed in a place under the exclusive jurisdiction of the United States? Such a claim would be preposterous.

In the case of *Tennessee* v. *Davis*, the defendant was indicted for murder in killing one, Haynes, while he was engaged in discharging his duties as a deputy-collector of internal revenue of the United States, and, which killing Davis claimed was in self-defense. The case was removed to the circuit court of the United States, under section 643, Rev. St. It was contended, that this act was an encroachment upon state rights, since it took away the right of the state, to determine, and execute its own criminal laws; and, was, therefore, unconstitutional. The supreme court sustained the act. It was held "that the United States is a government with authority extending over all the territory of the Union, acting upon the state, and the people of the state." In deciding the case, the court said:

"As was said in *Martin* v. *Hunter*, 1 Wheat. 363, the 'general government must cease to exist whenever it loses the power of protecting itself in the exercise of its constitutional powers.' It can act only through its officers and agents, and they must act within the states. If, when thus acting, and within the scope of their authority, those officers can be arrested and brought to trial in a state court, for an alleged offense against the laws of the state, yet warranted by the federal authority they possess, and if the general government is powerless to interfere at once for their protection; if their protection must be left to the action of the state court—the operations of the general government may at any time be arrested at the will of one of its members. The legislation of a state may be unfriendly. It may affix penalties to acts done under the immediate direction of the national government, and in obedience to its laws. It may deny the authority conferred by those laws. The state court may administer not only the laws of the state, but equally federal

law, in such a manner as to paralyze the operations of the government. And even if, after trial and final judgment in the state court, a case can be brought into the United States court for review, *the officer is withdrawn from the discharge of his duty during the pendency of the prosecution, and the exercise of acknowledged federal power arrested.* We do not think such an element of weakness is to be found in the constitution. The United States is a government with authority extending over the whole territory of the union, acting upon the states and upon the people of the states. While it is limited in the number of its powers, so far as its *sovereignty* extends it is supreme. No state government can exclude it from the exercise of any authority conferred upon it by the constitution, obstruct its authorized officers against its will, or withhold from it, for a moment, the cognizance of any subject which that instrument has committed to it." *Tennessee* v. *Davis,* 100 U. S. 262, 263.

These expositions of the territorial extent of the jurisdiction of the general government, are authoritative, and conclusive; and the result, is, that wherever the constitution and laws of the United States operate, at all, the state laws in conflict with them, are subordinate, and, those of the United States are supreme, and paramount. Numerous cases are reported in the books, wherein parties arrested for offenses under the state laws, for acts performed in the discharge of duties imposed by the laws of the United States, have been discharged from imprisonment on *habeas corpus* by the United States courts, in consonance with these principles, now, authoritatively, established by the supreme court of the United States, in the cases cited, and others in the same line. Thus, in *Ex parte Jenkins,* and others, deputy United States marshals, who were arrested on the warrant of a justice of the peace in Pennsylvania, for shooting and wounding a negro, who resisted an arrest attempted under a warrant issued by the United States court for a fugitive slave, Mr. Justice GRIER of the United States circuit court, took jurisdiction and discharged the petitioners, under the act of 1835, since carried into the Revised Statutes, as part of section 753, under which this case arises. After their discharge, they were arrested again, in a suit by the negro for trespass, upon a warrant issued by a judge of the supreme court of Pennsylvania, and again discharged on *habeas corpus* by the United States circuit court. After this they were indicted for the shooting, and wounding of the negro, by the grand jury of Luzerne county, and a third time released on *habeas corpus.* 2 Wall. Jr. 521 *et seq.* In the first of these cases Mr. Justice GRIER observes:

"What, then, have we power to do on the return of the writ? The writ of *habeas corpus* is a high prerogative writ known to the common law: the great object of which is the liberation of those who may be in prison without sufficient cause. It is in the nature of a writ of error, to examine the legality of the commitment. It brings the body of the prisoner up, together with the cause of his commitment. The court can, undoubtedly, inquire into the sufficiency of that cause. * * * Warrants of arrest issued on the application of private informers, may show on their face a *prima facie* charge sufficient to give jurisdiction to the justice; but it may be founded on mistake, ignorance, malice, or perjury. To put a case very similar to the present--A. tells B. that he has seen C. kill D. B. runs off to a justice, swears to the murder boldly, without any knowledge of the facts, and takes out a warrant for C., who is arrested and imprisoned in consequence thereof. C. prays a *habeas*

*corpus,* and shows that he was the sheriff of the county, and hanged D. in pursuance of a legal warrant. If a court could not discharge a prisoner in such a case because the warrant was regular on its face the writ of *habeas corpus* is of little use. The authority conferred on the judges of the United States by this act of congress gives them all the power that any other court could exercise under the writ of *habeas corpus,* or gives them none at all. If under such a writ they may not discharge their officer, when imprisoned ' by any authority,' for an act done in pursuance of a law of the United States, it would be impossible to discover for what useful purpose the act was passed. Is the prisoner to be brought before them only that they may *acknowledge their utter impotence to protect him?* * * * *"*

In *Ex parte Robinson,* Mr. Justice McLean held that " a writ of *habeas corpus* may issue to relieve an officer of the federal government who has been imprisoned under state authority for the performance of his duty." 6 McLean, 355. In the course of the decision the learned justice observes:

"It is a general principle of law, to which I know of no exception, that the laws of every government shall be construed by itself; and such construction is acted upon by ' the judiciary of all other countries. By the federal constitution the judicial power of the United States is declared to be vested in one supreme court, and in such inferior courts as the congress may from time to time order and establish.' Under this provision the judiciary of the Union gives a construction to the laws which is obligatory on the state tribunals. The constitution again declares: ' The constitution, and laws of the United States which shall be made in pursuance thereof, and all treaties made or which shall be made under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding.' " Id. 362.

Thus, it is the exclusive prerogative of the national courts to, finally, determine, whether an act performed by one of the officers of the United States, and, especially, an officer of the court itself, is done in pursuance of a law of the United States, or whether, when under arrest for acts performed in connection with his office, he is "in custody in violation of the constitution, or, of a law of the United States."

In the case of *U. S. v. Jailer of Fayette County,* 2 Abb. (U. S.) 265, a special deputy United States marshal was arrested, under the state laws, on a charge of murder, for a homicide committed by him in attempting to arrest one, Cull, upon a warrant issued by a commissioner of the United States circuit court, for offenses charged to have been committed under the internal revenue laws. Upon the hearing, the United States circuit court found, that, the homicide was committed in the performance of "an act done in pursuance of a law of the United States, or of a process of a court or judge of the same," and discharged the petitioner. The question of the jurisdiction of the court, and the facts, were, elaborately, discussed. So, in *Re Ramsey,* 2 Flip. 451, the prisoner was a deputy United States marshal, in custody by order of a state court, on a charge of murder, the homicide having been committed in an attempt to arrest, upon a warrant issued by the United States courts, the party

slain. The court found that the act was done in pursuance of a law of the United States; that petitioner was justified in the act which he performed, and discharged him. See, also, to the same effect, *In re Neill*, 8 Blatchf. 167; *In re Farrand*, 1 Abb. (U. S.) 140; *Case of Electoral College*, 1 Hughes, 571; *In re Hurst*, 2 Flip. 510; and cases collected in 29 Myer's Fed. Dec. 677. Thus it appears to be settled, beyond controversy, that, where a party is in custody by state authority, for an act done, or omitted to be done, in pursuance of any specific provision of a statute of the United States, imposing a duty upon him, or for an act performed justifiable by the circumstances of the case, in order to enable him to perform that duty, or in the execution of any order, or process, or decree, of a court of the United states, or of a judge thereof, the courts of the United States have jurisdiction to discharge him on *habeas corpus*, under section 753 of the Revised Statutes. In such a case, the laws of the United States are supreme, and the act cannot be an offense against the laws of the state, and, as we have before seen, whether an act is performed in pursuance of a law of the United States, is a question exclusively for the United States courts to, authoritatively, and, conclusively, determine. They must interpret finally the laws of the United States. With their decision the state cannot interfere. When the United States courts have spoken on the subject, the state has nothing more to do with it.

The only remaining questions to determine are: (1) Was the homicide, now in question, committed by petitioner, while acting in discharge of a duty imposed upon him by the constitution, or laws of the United States, within the meaning of section 753 of the Revised Statutes? (2) Was the homicide necessary, or was it reasonably apparent to the mind of the petitioner, at the time, and under the circumstances then existing, that the killing was necessary in order to a full and complete discharge of such duty?

It is urged that there is no statute, which, specifically, makes it the duty of a marshal, or a deputy-marshal, to protect the judges of the United States courts, while out of the court-room, traveling from one point to another in the circuit, on official business, from the violence of litigants, who have become offended at adverse decisions made by such judges in the performance of their judicial duties, and that marshals, or deputies, so engaged, are not within the provisions of section 753 of the Revised Statutes. It will be observed, that the language of the provision of section 753, is, "an act done * * * in pursuance of *a law* of the United States," not in pursuance of a *statute* of the United States. The statutes of Congress, in their express provisions, do not present all the law of the United States. Their incidents and implications are as much a part of the law as their express provisions. When they prescribe duties, provide for the accomplishment of certain designated objects, or confer authority in general terms, they carry with them all the powers essential to effect the ends designed. Says the supreme court in *Tennessee v. Davis*, 100 U. S. 264, quoting with approbation from Chief Justice MARSHALL:

"It is not unusual for a legislative act to involve consequences which are not expressed. An officer, for example, is ordered to arrest an individual. It is not necessary, nor is it usual, to say that he shall not be punished for obeying this order. His security is implied in the order itself. It is no unusual thing for an act of congress to imply, without expressing, this very exemption from state control. * * * The collectors of the revenue, the carriers of the mail, the mint establishment, and all those institutions which are public in their nature, are examples in point. *It has never been doubted that all who are employed in them are protected while in the line of their duty; and yet this protection is not expressed in any act of congress.* It is incidental to, and is implied, in the several acts by which those institutions are created; and is secured to the individuals employed in them by the judicial power alone —that is, the judicial power is the instrument employed by the government in administering this security."

If the officers referred to in the preceding passage are to be protected, while in the line of their duty, without any special law, or statute, requiring such protection, are not the judges of the courts—the principal officers in a department of the government second to no other—also to be protected, and are not their executive subordinates—the marshals, and their deputies—to be shielded from harm by the national laws, while honestly engaged in protecting the heads of the courts from assassination? When it was argued in *Siebold's Case*, that, it was not in the power of the United States to authorize the United States marshals to "*keep the peace*" at congressional elections, "*that the preservation of peace and good order in society is not within the powers confided to the government of the United States, but belonged exclusively to the state,*" we have seen the answer of the supreme court to that argument, in cases where the rights and interests of the *United States government were involved in the matter of keeping the peace.* "We hold it to be an incontrovertible principle," said the court, "that the government of the United States, may, by means of physical force, exercised through its official agents, execute on every foot of American soil the powers and functions that belong to it. This necessarily involves the power to command obedience to its laws, *and hence the power to keep the peace to that extent.*" And again:

"Why do we have marshals at all if they cannot physically lay their hands on persons and things in the performance of their proper duties? What functions can they perform, if they cannot use force? In executing the processes of the courts, must they call upon the nearest constable for protection? Must they rely upon him to use the requisite compulsion, and to keep the peace whilst they are soliciting and entreating the parties and by-standers to allow the law to take its course? This is the necessary consequence of the positions that are assumed. If we indulge in such impracticable views as these, and keep on refining and re-refining, we shall drive the national government out of the United States, and relegate it to the District of Columbia, or perhaps some foreign soil. We shall bring it back to a condition of greater helplessness than that of the old confederation." Id. 395, 396.

In this particular case, the petitioner, long before he reached Lathrop, endeavored, through the conductor of the train, and the proprietor of the eating-house, at that place, to have "*a constable*" in readiness, on the arrival of the train, *to keep the peace,* but without success. When too

late to prevent the tragedy, the constable appeared, and arrested the petitioner, for performing the duty, which it is, now, claimed, devolved, exclusively, upon himself, or, some other peace-officer of the state. Had the United States, in this instance, relied upon another government —the state of California—to keep the peace, as to one of their most venerable, and distinguished officers—one of the judges of their highest court—in relation to matters concerning the performance of his official duties, they would have leaned upon a broken reed; and there would, now, in all probability, be a vacancy on the bench of one of the most august judicial tribunals in the world, and the deceased—the would-be assassin—might, perhaps, be a tenant of the Stockton jail, to be disposed of by another government. The case affords a striking illustration of the necessity for the United States to protect their own officers, while in the discharge of their duties, and, by such protection, protect the nation itself. The result was, that, instead of arresting the conspirator in the contemplated murder—the wife of the deceased, armed with a loaded revolver, till relieved of it by a citizen—threatening death to Justice Field, calling upon the by-standers to aid her, and attempting to enter the car, with the avowed purpose of compassing his death, the officer of the United States, assigned by his government to the special duty of protecting the justice's life against these very parties, while in the actual performance of the duties, so assigned him, was, himself, arrested, without warrant, and disarmed by an inferior officer of the state, and interrupted in the discharge of those momentous duties, thereby, leaving his charge helpless, and without the protection provided by the government he was serving, at a time when such protection seemed most needed. Had Neagle been a deputy-sheriff of San Joaquin county, assigned, by his superior, to this very duty of protecting the life of Justice Field, under the state laws, and, in the performance of his duties, committed the homicide in all other respects under precisely the same circumstances, would he have been arrested by the constable of Lathrop, without a warrant, and disarmed with such inconsiderate haste, and, thereby, prevented from further performing his duty to protect the life and person of Justice Field, leaving him to pursue the remainder of his journey without protection? Yet the constable was informed, that Neagle was acting as a deputy United States marshal, under the orders of his superiors, for the protection of the life and person of a justice of the supreme court of the United States.

We do not wish to be regarded as, now, calmly, and, deliberately, looking back upon the scene, and sitting in judgment upon the action of the constable, or as passing censure upon his zeal. He, doubtless, in the emergency, where time for consideration was short, and the facts not fully appreciated, acted according to the best dictates of his judgment, necessarily, hastily formed. But when the state now comes in, after an arrest upon a warrant issued upon such flimsy testimony as that presented, and, deliberately, claims the exclusive right to sit in judgment upon the acts of the United States deputy-marshal, performed not upon his own interpretation of the law, but upon that of the attorney general

of the United States, who may be presumed to possess .some knowledge of his powers and duties, it is well to consider the circumstances from a stand-point presenting a view of both sides of the question.   In matters of the public peace, in which the national government is concerned, the marshals and deputy-marshals, within the scope of their authority, are *national peace-officers*, with all the statutory and common-law powers appertaining to peace-officers.   Is not the national public peace involved, when a deadly assault is, unexpectedly, made upon a judge in open court, in which the marshal, and his deputies, seeing the assault, are both authorized, and bound, on their own motion, without any previous order, or command, to interpose, and use sufficient force to quell the disturbance, and subdue the parties making it?   Yet where is there any specific provision of the statute imposing that duty upon them?   The marshal is required to attend court, but it is not provided, what he shall do in court.   To what end shall he be in court, if not to keep order, and, if necessary, to protect the judges from violence, by force, or any practicable means?   But there is no statute requiring it in terms.   The general duties of marshals are provided for in section 787, which reads as follows:

"It shall be the duty of the marshal of each district to attend the district and circuit courts when sitting therein, and execute throughout the district, all lawful precepts directed to him, and issued under the authority of the United States; and he shall have power to command all necessary assistance in the execution of his duty."

There is no more authority specifically conferred upon the marshal by this section to protect the judge from assassination, in open court, without a specific order, or command, than there is to protect him out of court, when on the way from one court to another, in the discharge of his official duties.   And the assassination in court, as well as out of it, might well be accomplished before the judge would be aware of his danger, and before it would be possible to give a command or order to the marshal for his protection.   The authority exists in the one case, as in the other, from the nature of the office, and the powers arising under the common law, recognized and in use in the country, and in the nature of things, inherent in the office.   The very idea of a government composed of executive, legislative and judicial departments, necessarily, comprehends, the power to do all things through its appropriate officers, and agents, within the scope of its general governmental purposes, and powers, requisite to preserve its existence, protect it, and its ministers, and give it complete efficiency in all its parts.   It necessarily and inherently includes power in its executive department to enforce the laws, keep the national peace with regard to its officers while in the line of their duty, and protect by its all-powerful arm all the other departments, and the officers, and instrumentalities, necessary to their efficiency, while engaged in the discharge of their duties.   In language attributed to Mr. ex-Secretary Bayard, used with reference to this very case, which we quote, not as a controlling judicial authority, but for its intrinsic, sound, common sense:

"The robust and essential principle must be recognized and proclaimed, that the inherent powers of every government which is sufficient to authorize and enforce the judgment of its courts, are, equally, and at all times, and in all places, sufficient to protect the individual judge who, fearlessly and conscientiously in the discharge of his duty, pronounces those judgments."

Our jurisprudence is derived from, and founded upon, that of England, and our judges, and officers are substantially the same. They have corresponding duties imposed upon them, and inherently possess corresponding executive powers, to enable them, to effectively perform their duties. From the foundation of our government, many of their common-law duties have been performed, and common-law powers exercised without specific or statutory direction, and without question; and the common-law principles governing them, except so far as inapplicable, or modified by statute, still remain in force. The observation of the supreme court of California, in the *Estate of Apple*, 66 Cal. 434, 6 Pac. Rep. 7, in which state a Code has been adopted with respect to the common law not abrogated or modified by the Code, is applicable here. Said the court:

"The Code establishes the law of this state respecting the subjects to which it relates: but this, of course, does not mean that there is no law with respect to such subjects except that embodied in the Code. When the Code speaks, its provisions are controlling, and they are to be liberally construed, with a view to effect its objects and promote justice—the rule of the common law that statutes in derogation thereof are to be strictly construed having been abolished here; but where the Code is silent, the common law governs."

So here, where the duties of the marshal are not limited, or specifically defined, by the statute, we must look to the powers and duties of sheriffs, at common law for them, so far as those duties come within the purposes, and powers of the national government. There are many acts, and duties, daily performed by the marshals, and by other officers, that are not specifically pointed out, or defined by the statute. The marshals are in daily attendance upon the judges, and performing official duties in their chambers. Yet no statute, specifically, points out those duties, or requires their performance. Indeed, no such places as chambers for the circuit judges, or circuit justices, are mentioned at all in the statutes. The judges' chambers do not appear to have any "local habitation." The justices of the supreme court at Washington have, in fact no chambers, otherwise, than, as they study, and do their work out of court, at a room in their own residences. We have in the San Francisco court-house rooms that we call chambers, in which the work of the judges out of court is, in part, but not wholly, performed. We apprehend that the marshal would as clearly be authorized to protect the judges here, in chambers, as in the court-room. All business done out of court by the judge is called "chamber business." But it is not necessary to be done in what is usually called, "chambers." Chamber business may be done, and often is done, on the street, in the judge's own house, at the hotel where he stops, when absent from home, or it may be done *in transitu*, on the cars, in going from one place to another, within the proper jurisdiction to hold court. Mr. Justice Field could, as well, and as author-

itatively, issue a temporary injunction, grant a writ of *habeas corpus*, an order to show cause, or do any other chamber business for the district in the dining-room at Lathrop, or in the cars, as at his chambers in San Francisco, or in the court-room.  He could have made a writ of *habeas corpus* returnable before himself on the car, and lawfully heard and decided the case while on his passage to San Francisco.  The chambers of the judge, where chambers are provided, are not an element of jurisdiction, but are a convenience to the judge, and to suitors—places, where the judge at proper times can be readily found; and the business conveniently transacted.  But the chambers of the judge, as a legal entity, are something of a myth.  For the purposes of jurisdiction, the chambers of the judge are wherever he happens to be in his circuit or district, when the exigencies of the case call for the transaction of chamber business, and a judge is as clearly engaged in the discharge of the duties of his office, when going from one place of holding court to another, for the purpose of holding court, and just as much entitled to protection from his own government against murderous or other assaults, from desperate suitors, on account of his judicial action, as when actually engaged in business at chambers, or in holding court.

In England, whence we derive our jurisprudence, the high sheriff of the shire was the keeper of the king's peace—that is to say, the keeper of the peace of the sovereignty which the king represents.  So here, I take it, under the authorities cited, the marshal is the keeper of the peace of the government of the sovereignty he serves, within the scope of the supreme powers of that government.  In England, in early days, it was the duty in every shire of the sheriffs not only to attend the courts, but to attend the judges through their circuits.  They met the judges at the border of the shire, and attended them until they left it at the border of another.  Dalt. Sher. c. 98, p. 369, (published in 1682.)  See, also, 40 Alb. Law J. 161.  Such is, also, understood to have been the practice in early days in a number of the states.  From the advancing state of civilization, this practice has, doubtless, generally become unnecessary for the safety of the judges, and it has fallen into desuetude.  But it does not follow, that the power to thus protect them has been abolished, or become extinguished.  It simply remains latent, or dormant, ready to be called into action, whenever the exigencies of the case, or times, require it.  And how could there possibly be a more urgent occasion for reviving the practice, and calling it into action, than the recent journey of Justice Field to Los Angeles, and return on official business?

Upon general, immutable principles, the power must, necessarily, be inherent in the executive department of any government worthy the name of government, to protect itself in all matters to which its authority extends, and this, necessarily, involves the power to protect all the agencies and instrumentalities necessary to accomplish the objects and purposes of that government.  In the national government of the United States, the judiciary constitutes one of its most important branches. Unlike the judiciary of other nations, it is invested with the jurisdiction

to pass, finally, and, conclusively, upon the powers of the legislative and executive departments of the government, and to confine them within their constitutional limits.    It is, therefore, the balance-wheel of the national government, that keeps it running, regularly, and, smoothly, within its proper domain.    Impotent, indeed, must be the executive branch of the government, if it is not empowered to protect the lives of the judges of the highest branch of its judiciary, from assault and assassination, on account of their judicial decisions, by desperate disappointed litigants, while passing from point to point within their territorial jurisdiction, in the discharge of their high functions, and duties. We cannot think the power can be wanting, even if there were no constitutional, or statutory provision, governing the case.    It seems impossible, that the national government should be left to the mercy, goodwill, or complacency of the state, to afford that protection to its judges, · that the United States, if worthy to be called a nation, are bound themselves to furnish.

As a further example of laws, not ordained by specific statutory enactments, see those respecting punishment for contempts.    For 40 years after the organization of the national government, down to 1831, there was no statute which, specifically, defined contempts of court.    *Ex parte Robinson*, 19 Wall. 510; *Ex parte Terry*, 128 U. S. 302, 303, 9 Sup. Ct. Rep. 77; *Ex parte Savin*, 131 U. S. 275, 9 Sup. Ct. Rep. 699.    But the courts, nevertheless, exercised the power, necessarily, from the nature of things inherent in every court, to protect itself, its dignity and its officers, by the punishment of many acts as contempts of their authority; and, they determined for themselves, what acts should constitute contempts.    The first specific act upon the subject passed by congress, was not an act enlarging the power of the court, but it was, on the contrary, a restriction of the powers already exercised within certain defined limits.    The act was passed at the instance of Senator Buchannan, to limit the power of the courts, theretofore, exercised, to punish for contempts, as a sequel to the impeachment of a United States judge for the district of Missouri.    The act was passed March 2, 1831, and is entitled, "An act declaratory of the law concerning contempts of court." 4 U. S. St. at Large, 487.    The first section does not *grant* the power to punish for contempts, but expressly recognizes the existing power, and, in express terms, thereafter, limits the power to certain enumerated cases.    In order that those who were before subject to punishment for contempt should not escape the penalties due their acts, section 2 of the statute makes certain acts, before punishable as contempts, offenses against the laws of the United States, punishable by the less summary, and more deliberate proceeding on indictment and trial by a jury. Many of the acts under that act, still recognized as punishable as contempts, as being necessary to the prompt and summary vindication of the authority of the court, are, also, indictable offenses under other statutes.    In *Ex parte Robinson*, 19 Wall. 510, the court expresses a doubt, as to the power of congress to thus limit the authority of the supreme court to punish for contempts which derives its jurisdiction directly from

the constitution. Yet, there is no express provision in the constitution. conferring jurisdiction to punish contempts. It is treated as a power necessarily inherent in the court, requiring no express authority.

This statute of 1831 has been carried into the Revised Statutes, section 1 of that act having been re-enacted in section 725 of the Revised Statutes, giving it a granting, as well as a restricting, form, but in no sense changing its purpose or meaning. And section 2 is now found in section 5399 of the Revised Statutes, as a part of the criminal code of the nation. Did anybody ever doubt, or does anybody now doubt, that the power of the United States courts to punish contempts, without any statutory definition of contempt, from the organization of the government down to 1831, was just as ample, and that it was just as much a part of the law of the United States, inherently, vested in the courts, as it was after the passage of the act of 1831, or as it is now under the same provisions carried into the Revised Statutes? Or did anybody doubt the authority of the courts to determine what acts constituted a contempt? Yet there was no specific provision of the statutes defining contempts. It was a power, however, necessarily, inherent in the courts. It is involved in the very idea of a court, having power to administer the laws of the land. It would be impossible for courts to perform their functions and administer the laws without it. And as so inherent, the power to punish various acts not mentioned as such, for contempt, was as much a part of the law of the United States as if ordained by a specific provision of the statute of the United States, and the authority of the marshal to protect the judges, is a cognate power, also necessarily inherent in the office he holds. Thus there is much law of the United States, not now found, in terms, in the statutes, but as valid and binding upon the people, and upon the states, as if it were, specifically, and, definitely, therein expressed. See *U. S.* v. *Hudson,* 7 Cranch, 32–34; *In re Meador,* 1 Abb. (U. S.) 324; *In re Buckley,* 69 Cal. 18, 10 Pac. Rep. 69.

But we are not without constitutional, and statutory provisions, broad enough, and, specific enough, as we think, to cover the case. The national constitution, providing a government for 65,000,000 of people, covers but a very few pages, but it seems to be amply sufficient for the purposes intended. Article 2, section 1 of the national constitution, provides that, "The executive power shall be vested in a president of the Unted States of America." In prescribing the duties of the president, in the terse but comprehensive language of section 3, art. 2, it provides that "he shall take care that the laws be faithfully executed." These provisions make him the executive head of the nation, and give him all the authority necessary to accomplish the purposes intended—all the authority, necessarily, inherent in the office, not otherwise limited. Congress, in pursuance of powers vested in it, has provided for seven departments, as subordinate to the president, to aid him in performing the executive functions conferred upon him. Section 346, Rev. St., provides that, "one of the executive departments shall be known as the 'Department of Justice,'" and, that, there shall be "an attorney general, who shall be the head thereof." He has general supervision of the executive branch of the

national judiciary, and section 362 provides as a portion of his powers and duties, that "the attorney general shall exercise general superintendence and direction over the attorneys and marshals of all the districts of the United States, and territories, as to the manner of discharging their respective duties; and the several district attorneys and marshals are required to report to the attorney general an account of their official proceedings, and of the state and condition of their respective offices, in such time and manner as the attorney general may direct." Section 788, Rev. St., provides that "the marshals and their deputies *shall have, in each state, the same powers in executing the laws of the United States, as the sheriffs and their deputies in such state may have, by law, in executing the laws thereof.*" By section 817 of the Penal Code of this state, the sheriff is a "*peace-officer.*" By section 4176, Pol. Code, he is "*to preserve the peace,*" and, "*prevent and suppress breaches of the peace.*" The marshal is, therefore, in accordance with the decision of the supreme court already referred to, and under the provisions of the statute above cited, "*a peace-officer,*" *so far as keeping the peace in any matter wherein the national powers of the United States are concerned, and as to such matters he has all the powers of the sheriff, as a peace-officer under the laws of the state. He is, in such matters,* "*to preserve the peace,*" *and* "*prevent and suppress breaches of the peace.*" An assault upon, or an assassination of, a judge of the United States court, while engaged in any matter pertaining to his official duties, on account, or by reason of his judicial decisions, or action in performing his official duties, *is a breach of the peace, affecting the authority and interests of the United States, and within the jurisdiction, and power of the marshal, or his deputies to prevent as a peace-officer of the national government.* Such an assault is not merely an assault upon the person of the judge, as a man. It is an assault upon the national judiciary, which he represents, and through it an assault upon the authority of the nation itself. *It is, necessarily, a breach of the national peace.* As a national peace-officer, under the conditions indicated, it is the duty of the marshal, and his deputies, to prevent a breach of the national peace by an assault upon the authority of the United States, in the person of a judge of its highest court, while in the discharge of his duty. If this be not so, in the language of the supreme court, before cited, "Why do we have marshals, at all?" What useful functions can they perform in the economy of the national government?

The constitution of the United States provides for a supreme court, with jurisdiction more extensive, in some particulars, than that conferred on any other national judicial tribunal. If the executive department of the government cannot protect one of these judges, while in the discharge of his duty, from assassination, by dissatisfied suitors, on account of his judicial action, then it cannot protect any of them, and all the members of the court may be killed, and the court, itself, exterminated, and the laws of the nation by reason thereof, remain unadministered, and unexecuted. The power and duty imposed on the president to "take care that the laws are faithfully executed," necessarily, carries with it all power, and authority necessary to accomplish the ob-

ject sought to be attained, and, certainly, the power and duty to protect from the deadly assaults of desperate suitors, the lives of the judges of the highest court in the nation, while engaged in the lawful discharge of their duties.

As we have before seen, neither constitution nor statutes can, or do, anticipate and point out, specifically, every possible right or duty to be covered and secured. They must, necessarily, be general. In the passage already cited from *Tennessee* v. *Davis*, the supreme court, in speaking of certain officers, says:

"It has never been doubted, that all who are employed in them are protected while in the line of their duty; *and yet this protection is not expressed in any act of congress. It is incidental to, and is implied in, the several acts by which those institutions are created;* and is secured to the individuals employed in them by the judicial power alone; that is, the judicial power is the instrument employed by the government in administering this security." 100 U. S. 265.

And in *U. S.* v. *Macdaniel,* 7 Pet. 14, similar views were expressed. Said the court:

"A practical knowledge of the action of any one of the great departments of the government must convince every person that the head of a department, in the distribution of its duties and responsibilities, is often compelled to exercise his discretion. He is limited in the exercise of his powers by law; but it does not follow that he *must show a statutory provision for everything he does. No government could be administered on such principles.* * * * *There are numberless things which must be done, that can neither be anticipated nor defined, and which are essential to the proper action of the government.*"

These observations are especially, and forcibly applicable to the terse but very comprehensive provisions of the constitution, and of the several statutes cited, as to the powers and duties of the president, the attorney general, and marshals.

The act of the attorney general, in directing the United States marshal to protect the life of Mr. Justice Field against the assaults of the deceased, and his wife, is, in legal contemplation, the act of the president. The president speaks, and acts, through the heads of the several executive departments in relation to subjects, which appertain to their respective duties. They are but the subordinates of the president, wielding his power. *Wilcox* v. *Jackson,* 13 Pet. 513; *U. S.* v. *Cutter,* 2 Curt. 617. In the former case, relating to a reservation of land by the secretary of war, the court said:

"Now although the immediate agent in requiring this reservation was the secretary of war, yet we feel justified in presuming that it was done by the approbation and direction of the president. The president speaks and acts through the heads of the several departments in relation to subjects which appertain to their respective duties."

See, also, 7 Op. Atty. Gen. 480, 481; Id. 453–479; *Confiscation Cases,* 20 Wall. 108, 109; *U. S.* v. *Eliason,* 16 Pet. 291.

By section 788, Rev. St., and the several provisions of the statutes of California herein cited, the United States marshal is made a peace-officer, and, as such, he is authorized to preserve the peace, so far as a breach of the peace affects the authority of the United States, and obstructs the operations of the government, and its various departments. The courts must, from the nature of things, be enabled fully to perform all their functions, imposed upon them by the constitution, and laws, without hindrance, or obstruction, and they must have the inherent power to protect themselves by, and through, their executive officers, under the direction, and supervision of the attorney general, and the president, against obstruction, and hindrance in the performance of their judicial duties. An assault upon a judge in court, or a judge, out of court, while in the performance of his duty, induced by his judicial action, and *intended, or calculated to obstruct him in, or deter him from, a free and full discharge of his duty, is a breach of the national peace affecting the sovereignty of the nation, and tending to obstruct and impair the operations and efficiency of one of the most important departments of the government.* As such, it is the duty of the United States marshal, under the police powers of the nation, so conferred upon him, by the statutes cited, and as a national peace-officer, to prevent such breach of the peace. Under the state laws deputy-sheriffs, when occasion requires, constables, and police-officers of cities, are assigned to certain districts, to watch over the safety of the citizens, and to guard, and protect their persons and property from assault, destruction or injury, *in short to prevent the commission of crimes,* etc. These officers, in cities, are found everywhere, night and day, guarding the citizen and his property from injury. So the attorney general, under the provisions of the statute cited, and the president under the provisions of the constitution, requiring him to see, that the laws are faithfully executed, are authorized, and empowered, to direct the assignment by the marshal, of any deputy to perform any special national police duty, within his jurisdiction, arising out of the statutes, whether by express provision, or necessary implication, and under any power, necessarily, inherent in the president, and government, in order to give full effect and efficiency to the government, or any of its departments. It has never, so far as we are advised, been doubted, that a marshal, or deputy-marshal is authorized to protect a judge, and preserve order, in open court, even by the use of force, without any special order, or command, as a part of the duties necessarily inherent in his office; yet, as we have already seen, there is no more specific statutory authority for so preserving order, and protecting the judge, in court, than for performing the same duty, under proper conditions, for a judge engaged in performing his duties, of whatever nature out of court.

It is argued by one of the counsel on behalf of the state, that these matters pertain, exclusively, to the peace of the state, and that the state has, not only, power to preserve the public peace, but, that it is amply capable of performing this service; that it is its duty to do it; that the threats of the deceased were matters of public notoriety; and, that, by calling the powers of the state into action, Justice Field's life might have

been protected by the state, and there would have been no necessity, whatever, for what is called on the part of the state, the illegal action of the United States marshal. It may be conceded, and it is undoubtedly true, that it was an imperative duty of the state to preserve the public peace, and to amply protect the life of Mr. Justice Field, *but it did not do it.* Where would Mr. Justice Field have been to-day, had he relied, solely, upon the state to perform her conceded imperative duty? Not having performed that obligation, while on his journey in discharge of his judicial duties, does a complaint now come with a good grace from the state, against the United States for performing it for her, as well as for the national government, by protecting one of their most distinguished judicial functionaries, through one of their own officers, in the only manner in which it could have been, effectively, performed?

In the present case, and on this official journey, there was a necessity for the kind of protection afforded Mr. Justice Field, for no other kind would have been adequate. The occasion required a preventive remedy. The use of the state police force, would have been impracticable, as the powers of the sheriff would have ended at the borders of his county, and of other township, and city peace-officers, at the boundaries of their respective townships, and cities. Only a United States marshal, or his deputy, could exercise these official functions throughout the United States judicial district, and as we have seen, the powers exercised concern matters affecting the peace of the national government, and if the national government has no authority to act in the premises, it, certainly, ought to have such power. The only remedy suggested, on the part of the state, was, to arrest the deceased, and hold him to bail to keep the peace under section 706, of the Penal Code, the highest limit of the amount of bail being $5,000. But, although the threats are conceded to have been publicly known, in the state, no state officer took any means to provide this flimsy safeguard.

Perhaps counsel intended to intimate that it was not the duty of the state, but of Mr. Justice Field, himself, to set in motion proceedings under the law furnished by the state, to put the decedent under bonds to keep the peace. Has it come to this, then, that a justice of the supreme court of the United States, when in obedience to the behests of the law, he comes to California to perform his judicial duties, must submit to the humiliation of immediately, upon his arrival, stealing away to some justice of the peace, and instituting proceedings to bind over to keep the peace, vindictive, and dangerous litigants who have threatened his life? But what security to Mr. Justice Field, would a bond of $5,000 afford against resolute, violent and desperate parties, for whom the penalties for murder have no deterring power? The United States marshal, the United States attorney for the district of California, the attorney general of the United States at Washington, and the mass of the people of California thought that the exigencies of the occasion required something more, and the result fully justified their view of the matter. Although no adequate means of protection were afforded by the state on his late official journey, and Mr. Justice Field would, in all probability, not now

be among the living, had not the petitioner, by the wise forethought of the attorney general, been detailed to protect his life, yet the fact of the failure of the state to perform its duty, does not afford any reason for taking the petitioner out of the custody of the state, unless, in committing the homicide, he was engaged in the performance of "an act done * * * in pursuance of a law of the United States," and the killing was justifiable. The failure to perform its duty would not, alone, oust the jurisdiction of the state, if it be exclusive. But since the possible remedy mentioned under the state law was alluded to by counsel, as ample, we refer to it, as illustrating the necessity for a speedy amendment of the laws of the United States, if they are now so defective, as to afford no protection to the United States judges, in the performance of their high functions. It is apparent to us, if he is not now so protected, that the distinguished justice allotted to the Ninth circuit, and also his associates, should have thrown over them the protecting ægis of the laws of that government, which he has so long, faithfully, and efficiently served.

After mature consideration, we have reached the conclusion, that the homicide in question, was committed by petitioner, while acting in the discharge of a duty imposed upon him by the constitution, and laws of the United States, within the meaning of the provisions of section 753 of the Revised Statutes.

It only remains to inquire, secondly, was the homicide necessary, or was it reasonably apparent to the mind of the petitioner, at the time and under the circumstances, then existing, that the killing was necessary, in order to a full and complete discharge of such duty? The answer to this proposition is, really, included in the answer to the last, but we desire to make some observations bearing, especially, upon it. The attorney general and counsel for the state declined to discuss the question, as to whether the homicide was justifiable, because, in their view, this is a question solely for the state court, the case, as claimed by them, not being within the provisions of section 753 of the Revised Statutes, and, therefore, not within the jurisdiction of this court. Holding, as we do, that the case falls within those provisions, so far as the petitioner was authorized to act, by the constitution and laws of the United States, it becomes necessary to determine whether the homicide was justifiable. For, if it was malicious, wanton, or reckless, without any reasonable apparent necessity, in order to fully and properly perform his duty of protecting Justice Field, then, it was an act performed beyond, and outside his duty, and he is amenable to the state courts. The facts set forth in the petition, and in the traverse to the return of the sheriff, are fully, and, satisfactorily, proved by the testimony, and, whether we determine the case upon demurrer to the traverse, or upon the whole case, as presented in the record, and evidence, the result must be the same. Were the question of justification to be determined by the laws of the state of California, or in the state court, there could be no ground for doubt. Says the Penal Code: "Homicide is also *justifiable* when committed by any person when resisting any attempt to murder any per-

son, * * * *or to do some great bodily injury upon any person.*" Section 197, Pen. Code. But we shall consider the question without reference to the statute of California.

It is unnecessary to repeat the facts in full. When the *deceased* left his seat, some 30 feet distant, walked, *stealthily*, down the passage in the rear of Justice Field, and dealt the unsuspecting jurist two preliminary blows, doubtless, by way of reminding him that *the time for vengeance* had at last come, Justice Field was, already, at the traditional "wall" of the law. He was sitting quietly at a table, back to the assailant, eating his breakfast, the side opposite being occupied by other passengers, some of whom were women, similarly engaged. When, in a dazed condition, he awoke to the reality of the situation, and saw the stalwart form of the deceased, with arm drawn back for a final mortal blow, there was no time to get under, or over, the table, had the law, under any circumstances, required such an act for his justification. Neagle could not seek a "wall" to justify his acts, without abandoning his charge to certain death. When, therefore, he sprang to his feet and cried, "Stop! Stop! I am an officer," and saw the powerful arm of the deceased drawn back for the final deadly stroke, instantly, change its direction to his left breast, apparently, seeking his favorite weapon, the knife; and at the same time heard the half-suppressed, disappointed, growl of recognition of the man, who, with the aid of half a dozen others, had finally succeeded in disarming him of his knife, at the court-room, a year before, the supreme moment had come; or, at least, with abundant reason, Neagle thought so, and fired the fatal shot. The testimony all concurs in showing this to be the state of facts, and the almost universal *consensus* of public opinion of the United States, seems to justify the act. On that occasion, a second, or two seconds, signified, at least, two valuable lives, and a reasonable degree of prudence would justify a shot one, or two, seconds too soon, rather than a fraction of a second too late. Upon our minds the evidence leaves no doubt, whatever, that the homicide was fully justified by the circumstances.

We have seen in an eastern law journal, but with its disapproval, some adverse criticism upon the action of the petitioner, attributed to a quarter, ordinarily, entitled to great consideration, and respect. But it is not for scholarly gentlemen of humane and peaceful instincts—gentlemen, who, in all probability, never in their lives, saw a desperate man of stalwart frame and great strength in murderous action—it is not for them sitting securely in their libraries, 3,000 miles away, looking backward over the scene, to determine the exact point of time, when a man in Neagle's situation should fire at his assailant, in order to be justified by the law. It is not for them to say that the proper time had not yet come. To such, the proper time would never come. Neagle on the scene of action, facing the party making a murderous assault, knowing, by personal experience, his physical powers, and his desperate character; and by general reputation, his life-long habit of carrying arms; his readiness to use them, and his angry, murderous threats; and seeing his demoniac looks, his stealthy assault upon Justice Field, from behind,

and, remembering the sacred trust committed to his charge,—Neagle, in these trying circumstances, was the party to determine, when the supreme moment for action had come; and if he, honestly, acted, with reasonable judgment, and discretion, the law justifies him, even if he erred. But who will have the courage to stand up in the presence of the facts developed by the testimony in this case, and say that he fired the smallest fraction of a second too soon? In our judgment he acted, under the trying circumstances surrounding him, in good faith, and with consummate courage, judgment, and discretion. The homicide was, in our opinion, clearly justifiable in law, and in the forum of sound, practical common sense,—commendable. This being so, and the act having been "done \* \* \* in pursuance of a law of the United States," as we have already seen, it cannot be an offense against, and the petitioner is not amenable to, the laws of the state. Let him be discharged.